UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CTIA – THE WIRELESS ASSOCIATION®, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TIM G. ECHOLS, in his official capacity as a commissioner of the Georgia Public Service Commission; CHARLES M. EATON, JR., in his official capacity as a commissioner of the Georgia Public Service Commission; HERMAN DOUGLAS EVERETT, in his official capacity as a commissioner of the Georgia Public Service Commission; LAUREN W. McDONALD, JR., in his official capacity as commissioner of the Georgia Public Service Commission; and STAN WISE, in his official capacity as a commissioner of the Georgia Public Service Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____ |
| Defendants. | ) ) ) | |

## COMPLAINT AND PRAYER FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff CTIA – The Wireless Association®, ("CTIA") files this Complaint

for declaratory and injunctive relief to prevent Defendants Tim G. Echols, Charles

M. Eaton, Jr., Herman Douglas Everett, Lauren W. McDonald, Jr., and Stan Wise,

each in his official capacity as a commissioner of the Georgia Public Service Commission (the "GPSC" and Defendants Echols, Eaton, Everett, McDonald, and Wise, collectively, "Commissioners" or "Defendants"), from giving effect to or enforcing amendments to Utility Rule 515-12-1-.35(3) that are preempted by federal law, the Communications Act of 1934, 47 U.S.C. § 151, *et seq.,* as amended (the "Communications Act" or "FCA").

CTIA hereby alleges as follows:

## PRELIMINARY STATEMENT

1.     On January 15, 2013, the GPSC voted 3-2 to adopt an amendment to Utility Rule 515-12-1-.35(3) that, if allowed to become effective, will *require* wireless telephone services providers, including CTIA members, to impose a new minimum monthly "service rate" of $5.00 (the "Minimum Rate Rule") on low-income Georgians who depend upon federally-subsidized wireless telephone services provided pursuant to the Federal Communication Commission's ("FCC") Lifeline program as their only telephone service.[1]   The FCC implemented the

---

[1]   A copy of the GPSC's Order adopting amended Utility Rule 515-12-1-.35(3) is attached hereto as Exhibit A.  On January 18, 2013, the GPSC filed a Notice of Proposed Rulemaking proposing further amendments to Utility Rule 515-12-1-.35(3) (the "January 18, 2013 NOPR", copy attached hereto as Exhibit B).  The amended Utility Rule 515-12-1-.35(3) proposed in the January 18, 2013 NOPR would require Eligible Telecommunications Carriers participating in the Lifeline program, including CTIA members who are wireless service providers, to "bill and

Lifeline program in 1985, as part of its longstanding mission to promote "universal service" and specifically to ensure that low-income Americans who meet established eligibility criteria have affordable access to telephone services.

2.     The Lifeline program provides a federally-funded monthly subsidy that is applied to reduce the service rate Eligible Telecommunications Carriers ("ETCs") who satisfy the criteria for participation in the Lifeline program would otherwise charge Lifeline-eligible customers for service.   Enrollment in the Lifeline program is available only to low-income households that qualify based on federal or state-specific economic and other eligibility criteria.   Persons eligible for enrollment in the Lifeline program include participants in Medicaid, the Supplemental Nutrition Assistance Program, and Temporary Assistance for Needy Families, among other programs.   Georgia households with annual income of less than 135% of the Federal Poverty Guidelines are also eligible for enrollment in the Lifeline program.   A single person with annual income below $14,702 or a family

collect a minimum monthly service rate of $5.00 after application of the federal Lifeline discount" from their Lifeline-enrolled customers.  Ex. B at 3 (proposed amended Utility Rule 515-12-1-.35(3)(f)).   The amendments proposed in the January 18, 2013 NOPR, thus, also include a Minimum Rate Rule.  The January 18, 2013 NOPR states that the further amendments to Utility Rule 515-12-1-.35(3) proposed therein "shall be considered for adoption at the Commission's regularly scheduled **Administrative Session on February 19, 2013 at 10:00 a.m.**" and that, "[i]f adopted, the rule shall become effective as provided for by law twenty (20) days after adoption by the Commission and subsequent filing with the Secretary of State."  *Id.* at 1 (emphasis in original).

of four with combined annual income of less than $30,173 would qualify under that criteria.[2]   Prospective enrollees must apply for admission to the Lifeline program, a process that includes completion of a detailed Lifeline eligibility certification form and submission of documentation that evidences eligibility for enrollment in the Lifeline program.

3.     Through innovation and competition, CTIA members have developed wireless telephone service plans that leverage the federal Lifeline subsidy to provide eligible low-income Georgian households with wireless telephone service at no cost to those households.   These no-cost wireless service plans further the aims of the Lifeline program and the FCC's universal service mandate, helping to ensure that more than 450,000 low-income Georgia households have access to the public telecommunications network to pursue employment, remain in contact with family, and access critical medical, social, and emergency services.    Many Georgians who receive Lifeline-subsidized wireless telephone services provided by CTIA members have no landline telephone service and rely on their Lifeline wireless telephone service as their only telephone service.

4.     The GPSC adopted the Minimum Rate Rule with the express intent and purpose of precluding wireless telephone service providers participating in the

[2]  *See* Annual Update of the HHS Poverty Guidelines, 76 Fed. Reg., 3637-38 (Jan. 20, 2011).

Lifeline program, including CTIA members, from offering eligible Georgians the no-cost wireless service plans that those wireless providers, assisted by support from the federal Lifeline program, have made possible to connect needy Georgian families to telecommunications service.  If it is allowed to become effective, there is no question that the Minimum Rate Rule will have the effect of precluding CTIA members and other wireless carriers from offering such services.  The results will be disastrous, both for the hundreds of thousands of low-income Georgia households that presently rely on no-cost wireless service plans provided by CTIA members as their only means of accessing telecommunications services, and for the CTIA members who will be forced to comply with the Minimum Rate Rule by raising rates charged to their Lifeline-eligible customers.

5.     Many of the hundreds of thousands of low-income Georgia households that presently rely on Lifeline-subsidized wireless services will no longer be able to afford telephone service if the Minimum Rate Rule is allowed to become effective.  Tellingly, just last year, the FCC – the federal agency charged with administering the Lifeline program and overseeing wireless service rates – considered and rejected implementing a minimum $5.00 monthly charge for Lifeline subscribers, finding that the imposition of such a charge "would

potentially pose a significant barrier to participation for those in severe economic need."[3]

6.     The Minimum Rate Rule also will cause CTIA members to lose customers and goodwill and will impose incalculable financial and administrative costs on many CTIA members for which there will be no recourse.

7.     None of that should be permitted to happen.  The Minimum Rate Rule, which facially *requires* wireless service providers to charge customers a rate in excess of the rate they would otherwise charge for service, is preempted by Section 332(c)(3)(A) of the Communications Act.  Section 332(c)(3)(A) expressly provides that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service."  47 U.S.C. § 332(c)(3)(A).  On its face, the Minimum Rate Rule imposes a minimum "service rate" that commercial mobile service (wireless) providers, including CTIA members, must charge their Lifeline-enrolled customers for service each month.  The Minimum Rate Rule thus indisputably regulates "the rates charged by any commercial mobile service," and is preempted by Section 332(c)(3)(A).

---

[3]  Lifeline and Link Up Reform and Modernization, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC 6656 (2012) ("Lifeline Order") at ¶ 268.

8.     Because the Minimum Rate Rule is preempted by Section 332(c)(3)(A) of the Communications Act, CTIA seeks an injunction preventing the Commissioners from giving effect to or enforcing the Minimum Rate Rule, along with declaratory relief and other appropriate remedies.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this lawsuit, pursuant to 28 U.S.C. § 1331.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).  Because CTIA seeks declaratory and injunctive relief from state regulation preempted by the laws of the United States, CTIA's claims arise under federal law and are therefore within this Court's jurisdiction.  *See CSX Transp. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1576 (N.D. Ga. 1996).  CTIA seeks a declaration of its rights in this case of actual controversy, pursuant to 28 U.S.C. §§ 2201-2202.

10.    This Court also has diversity jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1332.  Plaintiff CTIA is District of Columbia non-profit corporation with its principal place of business in Washington, D.C. Each of the Defendants is a resident of the State of Georgia, and the amount in controversy exceeds $75,000.

11.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, because Defendants are government officials who perform official duties in this judicial district and because substantial parts of the events giving rise to CTIA's claims have occurred in this judicial district.

## PARTIES

12.     CTIA is a District of Columbia non-profit corporation with its principal place of business in Washington, D.C.  CTIA represents all sectors of the wireless industry, including but not limited to providers of wireless services, and sellers of wireless services, including prepaid wireless services, handsets and accessories.

13.     Several of CTIA's members – including, for instance, Virgin Mobile USA, LP d/b/a Assurance Wireless ("Assurance Wireless"), and TracFone Wireless, Inc. ("TracFone") – provide wireless telephone and electronic communications services to Georgia customers as ETCs, and therefore will be subject to the requirements of the Minimum Rate Rule if it is allowed to become effective.

14.     CTIA has associational standing to bring and maintain this action. One or more of CTIA's members would have standing to sue in their own right.  In addition, the interests that CTIA seeks to protect are germane to its members and

CTIA's purpose, and neither the claims asserted nor the relief requested require the participation of individual members in this lawsuit.

15.    Defendant Charles M. Eaton, Jr. is a commissioner of the GPSC and is made a party to this action in that official capacity.  He is a resident of Georgia.

16.    Defendant Tim G. Echols is a commissioner of the GPSC and is made a party to this action in that official capacity.  He is a resident of Georgia.

17.    Defendant Herman Douglas Everett is a commissioner of the GPSC and is made a party to this action in that official capacity.  He is a resident of Georgia.

18.    Defendant Lauren W. McDonald, Jr. is a commissioner of the GPSC and is made a party to this action in that official capacity.  He is a resident of Georgia.

19.    Defendant Stan Wise is a commissioner of the GPSC and is made a party to this action in that official capacity.  He is a resident of Georgia.

## **THE GPSC**

20.    The GPSC, which is not a party to this action, is a governmental agency of the State of Georgia.  The GPSC voted 3-2 to adopt the Minimum Rate Rule.  GPSC's principal place of business is in Atlanta, Georgia.

# FACTS

## I.     The FCC's Lifeline Program

### A.     The Critical Role the Lifeline Program Plays in Connecting Low-Income Americans to Telephone Services and Meaningful Participation in the American Society and Economy

21.     The FCC implemented the Lifeline program in 1985, as part of its longstanding mission to promote "universal service."[4]  "Universal service" refers to Congress's direction to the FCC, in the Communications Act, "to make available, so far as possible, to all the people of the United States, . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges."[5]

22.     The Lifeline program was developed specifically to ensure that low-income Americans who meet established eligibility criteria would have affordable access to telephone services.  The program was implemented in 1985 in the wake of the 1984 divestiture of AT&T.  Its initial purpose was to ensure that any increase in local rates that occurred following major changes in the marketplace would not put local phone service out of reach for low-income households and result in service disconnections.  At the time, the FCC was concerned that the implementation of a subscriber line charge would force low-income consumers to

---

[4]  *See* Lifeline Order at ¶¶ 11-12.
[5]  47 U.S.C. § 151 (creating the FCC).

drop voice service, which, the FCC found, had "become crucial to full participation in our society and economy, which are increasingly dependent upon the rapid exchange of information."[6] That has only become more true today.

23.    In the Telecommunications Act of 1996, Congress codified the FCC's commitment to advancing the availability of telecommunications services to all Americans and established principles upon which "the [FCC] shall base policies for the preservation and advancement of universal service."  47 U.S.C. § 254(b). Among other things, Congress articulated national goals that services should be available at "affordable" rates and that "consumers in all regions of the nation, including low-income consumers, . . . should have access to telecommunications and information services."    47 U.S.C. § 254(b)(1)&(3).   After passage of the Telecommunications Act of 1996, the FCC revised and expanded the Lifeline program.  Thereafter, all states participated in the program and the level of federal Lifeline support steadily increased.

24.    The Lifeline program provides a benefit to enrolled persons in the form of a monthly subsidy that is applied to all or a portion of the amounts charged by participating telephone service providers to provide such enrolled persons with their monthly telephone service.  The subsidy is funded by the Universal Service

---

[6]  *See* Lifeline Order at ¶ 12 (citation omitted).

Fund (the "USF") established by the FCC to promote universal service initiatives such as the Lifeline program. The USF in turn is funded by mandatory contributions by all providers of telecommunications services, the costs of which are passed on to those providers' customers. The FCC establishes the amount of the federal Lifeline subsidy – which is currently set at $9.25 per month.

25.    According to the FCC, evidence suggests that Lifeline has been instrumental in increasing the availability of quality voice service to low-income consumers. Indeed, many low-income consumers have stated on the record before the FCC that without a Lifeline subsidy, they would be unable to afford service. Low income-consumers have also described the hardships they would face without access to phone service. When consumers are only able to intermittently remain on the network, they are not fully connected to society and the economy because, among other things, they are unable to apply for and receive call-backs for jobs or reach important social services, health care, and public safety agencies on a reliable basis.

26.    Telephone subscribership among low-income Americans has grown significantly since the Lifeline program was initiated in 1984. Only eighty percent of low-income households had telephone service in 1984, compared to 95.4

percent of non-low-income households.[7]  Since the inception of Lifeline, the gap between telephone penetration rates for low-income and non-low-income households has narrowed from about 12% in 1984 to 4% in 2011.[8]

27.   The FCC has found that the Lifeline program "provide[s] the best source of assistance for individuals to obtain and *retain* universal service, and, therefore, help[s] maintain and improve telephone subscribership."  As the FCC has observed, there are substantial benefits to increasing the availability of communications services for low-income Americans.  According to the FCC, all consumers, not just low-income consumers, receive value from the network effects of widespread voice subscribership.  Moreover, those consumers without affordable, quality voice services are at a disadvantage in accessing public safety and health care resources, social and economic resources, and employment opportunities.  As the FCC has recognized, voice service is particularly important for low-income consumers, who often must juggle multiple jobs and interviews for new employment as well as keep in contact with social service agencies.

---

[7] *See* Federal Communications Commission, Industry Analysis and Technology Division, Universal Service Monitoring Report at text accompanying table 3.2 (2011) ("2011 Monitoring Report") ("low-income" is defined as households with annual income of $9,999 or less), *available at* http://transition.fcc.gov/Daily_Releases/Daily_Business/2011/db1229/DOC-311775A1.pdf.

[8] *See* Lifeline Order at ¶ 15.

28.    In a letter to the FCC, expressing support for the Lifeline program, several members of Congress wrote:  "a cell phone can literally be a Lifeline for families and provide low-income families, in particular, the means to empower themselves."[9]

29.    If quality voice service is not affordable, low-income consumers may subscribe to voice service at the expense of other critical necessities, such as food and medicine, or may be unable to purchase sufficient voice service to obtain adequate access to critical employment, health care, or educational opportunities. Further, if low-income consumers initially subscribe to phone service, but intermittently lose access because they cannot consistently pay for the service, many of the benefits for individuals and the positive externalities for the economy and society will be lost.

**B.    The Pivotal Role Wireless Services Providers Have Played in Advancing the Goals of the Lifeline Program**

30.    As the telecommunications industry has evolved, so too has the Lifeline program.   Providers of wireless telephone services, including many members of CTIA, have played an especially significant role in advancing the goals of the Lifeline program by expanding its reach to benefit Americans in

---

[9]  Letter from Senators Robert Menendez, Kirsten E. Gillibrand, Sherrod Brown, and & Jeanne Shaheen, to Hon. Julius Genachowski, Chairman, Federal Communications Commission, OL Dkt. No. 11-9 (filed with FCC, Sept. 13, 2011).

critical need of affordable access to telephone services. Accordingly, wireless Lifeline enrollment has greatly increased, consistent with the same trend toward wireless service in the general population. In its 2012 Lifeline Order, the FCC observed that wireless services have taken on particular importance to low-income consumers, who are more likely to reside in wireless-only households than consumers at higher income levels.[10]

31.    The FCC has noted that wireless providers' increasing participation in the Lifeline program has provided additional options for reaching more low-income consumers with Lifeline service during a time period in which declining economic conditions and increasing pressure on the poorest Americans has made the need for the benefits the Lifeline program provides all the more acute.[11]  Since 1999, real median household income in the U.S. has declined by 7.1 percent, while households at the bottom of the income scale have seen their income decline by 12.1 percent.[12]  In 2010, 46.2 million Americans were living in poverty, defined as

---

[10]   *See* Lifeline Order at ¶ 21.

[11]   *Id.* at ¶ 23.

[12]   United States Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States:  2010 (2010 Census Report on Poverty), at 5 (Sept. 2011), *available at* http://www.census.gov/prod/2011pubs/p60-239.pdf.

living at or below the benchmark established in the Federal Poverty Guidelines,[13] compared to 31.6 million in 2000.[14]

32.    Beginning in 2005, the FCC permitted certain non-facilities based providers, including prepaid wireless carriers, to obtain low-income support from the USF, which has further expanded low-income Americans' options for accessing affordable telephone services.  Since 2005, a number of prepaid wireless providers, including CTIA member Assurance Wireless, have become Lifeline-only ETCs, competing for low-income subscribers by marketing telephone service that provides a specified number of minutes at no charge to the consumer.  Other CTIA members, like TracFone, offer no-cost and other wireless plans to eligible Lifeline subscribers as well as standard wireless plans.  The FCC has observed that this development has expanded choices in many states for low-income consumers, who now have greater access to mobile services than they did a decade ago, and has likely contributed to the increasing telephone penetration rate of consumers

---

[13]   Annual Update of the HHS Poverty Guidelines, 76 Fed. Reg., 3637-38 (Jan. 20, 2011).

[14]   *See* 2010 Census Report on Poverty at 62.

making less than $10,000 a year.  Prepaid wireless ETCs now account for more than 40 percent of all Lifeline support.[15]

## II.   Section 332 Of The Communications Act's Prohibition Of State Regulation Of Wireless Service Rates

33.     The innovative services and rate plans wireless service providers, including CTIA members, have developed have expanded the reach of the Lifeline program and furthered its goals.   Moreover, those benefits have been made possible as the direct result of the deregulatory, pro-competitive approach Congress and the FCC have taken with respect to regulation of wireless providers and, in particular, their reliance on the competitive market to determine the rates wireless providers charge their customers for service.

34.     Congress has enacted legislation codifying those deregulatory, pro-competitive policies concerning wireless service rates.   In 1993, Congress amended the Communications Act "to dramatically revise the regulation of the wireless telecommunications industry."   *Connecticut Dep't of Pub. Util. v. FCC*, 78 F.3d 842, 845 (2d Cir. 1996).   The 1993 amendments included two key provisions that are relevant here.   First, Congress amended Section 2(b) to give the FCC plenary authority over all aspects of wireless service, whether jurisdictionally

---

[15]  *See* Universal Service Administrative Company, 1Q 2012 Filing, Appendices at LI04 (Quarterly Low-Income Disbursement Amounts by Company (3Q2011), *available at* http://www.usac.org/about/governance/fccfilings/2012/quarter-1.aspx.

"intrastate" or "interstate."  *See* 47 U.S.C. § 152(b).  Second, Congress expressly preempted state regulation of the rates charged for wireless services by adding Section 332(c)(3)(A), which provides:  "[N]o State or local government shall have any authority to regulate the entry of or *the rates charged by* any commercial mobile service . . . , except that this paragraph shall not prohibit a State from regulating the *other* terms and conditions of commercial mobile services." 47 U.S.C. § 332(c)(3)(A) (emphasis added).  Together, these 1993 amendments preempted state regulation of the rates charged for wireless services by eliminating the dual regulatory system whereby states previously had authority to establish rates for intrastate wireless services.  *See Louisiana Public Service Commission v. FCC,* 476 U.S. 355 at 364, 371 (1986); *California v. FCC,* 798 F.2d 1515 at 1520 (D.C. Cir. 1986).

35.    Congress recognized that "state regulation can be a barrier to the development of competition in [the wireless] market, [and that a] uniform national policy is necessary and in the public interest."[16]  With respect to wireless services, "the public interest" has always meant championing deregulatory and competitive policies to the benefit of both consumers and business.  Through the 1993 amendments limiting states' authority to regulate commercial mobile/wireless

---

[16]  H.R. Rep. No. 103-213, at 480-81 (1993).

services, Congress sought to achieve its view of a uniform, nationwide deregulatory environment for commercial mobile services by centralizing authority in the FCC and directing it to rely upon market forces, not regulation. Specifically, Congress intended Section 332(c)(3)(A) to avoid "balkanized state-by-state" rate regulation and thereby to foster the growth and development of mobile services, which, by their nature, operate without regard to state lines and are an integral part of the national telecommunications infrastructure.

36.     The freedom from the constraints of an unpredictable patchwork of potentially inconsistent state level regulation of rates that Section 332(c)(3)(A) provides has allowed wireless service providers to innovate and compete to provide Americans with a broader and more convenient array of telephone service options. The prepaid and no-cost wireless service plans that mobile providers have developed to serve eligible Lifeline participants represent important examples of the benefits to consumers that Section 332(c)(3)(A)'s prohibition on state regulation helps make possible.

## III.    The FCC's Extensive Regulation Of The Lifeline Program

37.     Although the FCC has, on the whole, favored a deregulatory, precompetitive approach to the exercise of its delegated oversight of wireless services, the FCC has also devoted substantial time, attention, and effort to

ensuring that the Lifeline program is administered in a manner that conserves the precious resources of the USF while effectively promoting the Lifeline program's important goals.  In its 2012 Lifeline Order, the FCC exercised its jurisdictional authority to establish rates for wireless Lifeline service (covering both intrastate and interstate service) by considering, but ultimately rejecting, a proposed $5.00 monthly minimum charge on Lifeline-subsidized telephone services.  The FCC has not hesitated to impose rules and regulations governing the Lifeline program that, after careful and thorough consideration, the FCC deemed necessary and appropriate to safeguard against waste, fraud, and abuse; improve program administration and accountability; and ensure that USF resources are responsibly deployed to meet the Lifeline program's goals while conserving USF funds and, ultimately, reducing the contribution burden on the public at large.

38.   In its 2012 Lifeline Order, the FCC enacted a number of reforms intended to further these aims.  The FCC set a goal to save $200 million in USF funds during 2012 through reforms designed to, among other things, eliminate fraud, waste, abuse, and inefficiency in the Lifeline program.  Such reforms included stepped-up efforts by the Universal Service Administration Company ("USAC"), the entity that administers the USF at the FCC's direction, to conduct In-depth Data Validations ("IDVs") of ETC subscriber records to identify

subscribers receiving Lifeline support from multiple ETCs and require such persons' de-enrollment from duplicate support services.  Between the January 2012 adoption of the Lifeline Order and the end of the year 2012, USAC completed six phases of IDVs in a total of 23 states, resulting in approximately $45 million in savings.[17]  To ensure that ETCs are reimbursed only for service that is actively utilized by low-income subscribers, the FCC also required ETCs that do not assess or collect a monthly fee from subscribers to de-enroll subscribers who have not used the service for a consecutive 60-day period.[18]  The FCC also imposed enhanced proof of eligibility requirements that must be satisfied before an ETC can enroll a prospective Lifeline subscriber as well as requirements that ETCs undertake procedures to re-certify the eligibility of existing Lifeline subscribers and de-enroll any subscribers whose eligibility the ETCs could not confirm.[19] These and other substantial reforms and initiatives undertaken and advanced during 2012 at the FCC's direction resulted in savings well in excess of the $200

---

[17]   Federal Communications Commission, Wireline Competition Bureau, Final Report on Lifeline Program Savings Target (Jan. 31, 2013) at 2, *available at*: http://transition.fcc.gov/Daily_Releases/Daily_Business/2013/db0131/DA-13-130A1.pdf.
[18]   *Id.* at 3-4.
[19]   *Id.* at 4.

million goal the FCC set for 2012, and the FCC projects that such savings will continue to accrue in 2013 and beyond.[20]

## IV.    The GPSC's Minimum Rate Rule

39.    The GPSC's Minimum Rate Rule flies in the face of Section 332(c)(3)(A) of the Communications Act's prohibition of state regulation of wireless service rates and is preempted by that provision of federal law.

40.    The Minimum Rate Rule facially purports to regulate the rates wireless service providers who are ETCs participating in the Lifeline program, including many CTIA members, charge their Lifeline-enrolled customers for service by expressly requiring that:   "An Eligible Telecommunications Carrier ***shall charge a minimum monthly service rate*** *of $5.00 per month*, after application of the Federal Lifeline discount."   *See* Ex. A, Rule 515-12-1-.35(f) (emphasis added).

41.    Wireless service providers, including CTIA members, currently provide wireless telephone services to Lifeline-enrolled households at rates lower than the $5.00 monthly minimum "service rate" the Minimum Rate Rule would require, and many of those providers would continue to provide services to their Lifeline-enrolled customers at such lower rates if not for the Minimum Rate Rule.

---

[20]  *Id.* at 1, 5.

42.     By requiring wireless service providers participating in the Lifeline program to impose a minimum monthly service rate charge on their Lifeline-enrolled customers, the Minimum Rate Rule purports to regulate "the rates charged by any commercial mobile service" in contravention of Section 332(c)(3)(A)'s express directive that "no State or local government shall have any authority to regulate" such rates.

43.     The Minimum Rate Rule is, thus, expressly preempted by Section 332(c)(3)(A).  Accordingly, the Minimum Rate Rule should be declared invalid, and this Court should enjoin the Commissioners from giving effect to or enforcing the Minimum Rate Rule.

## IV.    The Irreparable Harm The Minimum Rate Rule Will Cause

44.     If the Minimum Rate Rule is allowed to become effective, wireless service providers, including CTIA members, and many of the hundreds of thousands of needy Georgia households that depend on the no-cost, prepaid, and other Lifeline-subsidized services that CTIA members have been able to provide in the absence of the Minimum Rate Rule will suffer immediate and irreparable harm.

### A.     The Irreparable Harm to CTIA Members

45.     If allowed to become effective, the Minimum Rate Rule will cause CTIA members to suffer immediate and irreparable harm.

23

46.     CTIA members providing Lifeline service in the state of Georgia will suffer the loss of their Lifeline-enrolled customers who are unable to afford the $5.00 monthly minimum service.  CTIA members will also lose Lifeline-enrolled customers who might be able to afford to pay $5.00 per month for telephone services, but for whom the actual cost of paying the $5.00 minimum monthly charge will greatly exceed $5.00 because such customers lack bank accounts, credit cards, or other viable means of making non-cash payments for goods and services.   Such "unbanked" customers represent a significant portion of the Lifeline-subsidized customers of several CTIA members.   Unbanked customers would have to rely on expensive methods like money orders to pay the minimum monthly rate imposed by the Minimum Rate Rule.  Such payment methods can entail additional service fees as high as $12.99 per transaction, meaning that, for such customers, the actual cost of paying the minimum monthly service rate imposed by the Minimum Rate Rule could be as high as $17.99 per month.

47.     In addition to losing customers, CTIA members would lose goodwill as the result of being forced to comply with the Minimum Rate Rule.  Customers who have come to rely on no-cost Lifeline-subsidized services will be shocked and infuriated to learn that they must suddenly begin paying a minimum of $5.00 per month to continue to receive service.  Customers will doubtless feel they are the

24

victims of "bait-and-switch" tactics or that CTIA members have otherwise failed to fulfill their promises, and will blame CTIA members for the new minimum monthly service rate even though it was the GPSC who imposed the new monthly rate through the Minimum Rate Rule.  The consequent loss of goodwill to CTIA members is not subject to reasonable measurement or calculation and constitutes irreparable harm.

48.    CTIA members would also suffer severe but incalculable economic and administrative costs in connection with having to extensively modify and supplement their existing information technology systems, customer service and advertising functions, and other systems and procedures to accommodate and effect compliance with the Minimum Rate Rule.

49.    Finally, CTIA members would be unjustly deprived of revenues that they will not be able to recover as the result of the GPSC's wrongful adoption of a Minimum Rate Rule that is patently preempted by federal law and outside the scope of the GPSC's authority to enact in the first instance.

50.    For all of these and other reasons, CTIA members will suffer irreparable harm if the Minimum Rate Rule is allowed to become effective.

### B.    The Irreparable Harm to Low-Income Georgians

51.    The impact of the Minimum Rate Rule on the low-income Georgia families the Lifeline program was designed to help will be even more devastating.

52.    In its 2012 Lifeline Order, in which the FCC considered but rejected a proposed $5.00 monthly minimum charge on Lifeline-subsidized telephone services, the FCC noted its "serious concerns about the unintended costs of imposing a minimum charge." The FCC found that that a minimum charge could potentially discourage consumers from enrolling in the program and could result in current Lifeline subscribers leaving the program. The FCC acknowledged a survey conducted by CTIA member TracFone which showed that almost 65 percent of TracFone's responding consumers stated that they would de-enroll from the Lifeline program instead of paying a mandatory charge.

53.    The FCC further noted the increased (but hidden) burden that a minimum monthly charge would have on Lifeline-enrolled Georgians who are "unbanked" – *i.e.,* lack a bank account, credit card, or other viable means of making non-cash payments for goods and services. As the FCC stated:

> We are concerned that requiring a minimum consumer
> charge could be burdensome for those low-income
> consumers who lack the ability to make such payments
> electronically or in person, potentially undermining the
> program's goal of serving low-income consumers in
> need.  We conclude that imposing a minimum charge

26

could impose a significant burden on some classes of Lifeline consumers. For example, making regular payments to an ETC, even when those payments are minimal, may be difficult for low-income consumers who do not have bank accounts and might fail credit checks. **TracFone reports that 60 percent of its Lifeline subscribers do not have checking accounts, credit cards, or debit cards, and would have no alternative other than to use money transfer services or purchase money orders to make minimum payments**. Further, **the cost of a money transfer is likely to exceed the nominal $1-$5 monthly fee that some parties advocate**, significantly raising the effective cost of Lifeline services for low-income consumers. For example, **one commenter notes that a Western Union money transfer for $1 would cost consumers $12.99 in fees.** We have serious concerns about the unintended costs of imposing a minimum charge.[21]

54.     Ultimately, the FCC rejected a minimum charge that might have such dire consequences for participation in the Lifeline program, which the FCC noted serves "the truly neediest of the population in the most dire economic circumstances and for whom even a routine charge is an excessive financial burden."[22]

55.     The concerns regarding the impact of a minimum charge on low-income consumers that were voiced by the FCC in its Lifeline Order were also reflected in the proceedings that ultimately resulted in the GPSC's adoption of the

---

[21] Lifeline Order at ¶ 266.

[22] *Id.* at ¶ 267.

Minimum Charge Rule.  Representatives of CTIA members and other service providers spoke to the devastating impact a minimum charge would have on the ability of many of their customers to afford telephone service under the Lifeline program.  Brian Herbert, the President of Apex Veteran Staffing, spoke to the importance of Lifeline-subsidized telephone access to low-income veterans seeking employment, and to the burden a $5.00 monthly charge would place on veterans and their families.  Private citizen Evanne Hines implored the GPSC to reject a $5.00 minimum monthly charge that will force many needy Georgians to choose between phone service and a meal or necessary medication.  Unfortunately, such concerns did not sway the GPSC, which adopted the Minimum Rate Rule by a 3-2 vote.

56.    If the Minimum Rate Rule is permitted to take effect, hundreds of thousands of low-income Georgians who depend on the Lifeline program would lose access to the vital telecommunications services that the FCC has proclaimed are "crucial to full participation in our society and economy," and which are necessary to keep those persons connected to family, community, job opportunities, and health and emergency services, and would thereby suffer irreparable harm.

## CLAIMS FOR RELIEF
## COUNT I DECLARATORY RELIEF:
## EXPRESS PREEMPTION UNDER § 332 OF THE FCA

57.     CTIA incorporates the preceding paragraphs by reference as though set forth fully herein.

58.     Section 332 of the FCA expressly provides that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service."  47 U.S.C. § 332(c)(3)(A).

59.     The Minimum Rate Rule conflicts with § 332(c)(3)(A) of the FCA by requiring commercial mobile service providers designated as ETCs to charge a minimum monthly service rate of $5.00.

60.     Accordingly, the Minimum Rate Rule is preempted by § 332(c)(3)(A) of the FCA and is invalid pursuant to the Supremacy Clause of the United States Constitution.

61.     Pursuant to 28 U.S.C. § 2201, a declaration is necessary and appropriate to specify that the Minimum Rate Rule is preempted by § 332 of the FCA and thus invalid.

## COUNT II

## INJUNCTIVE RELIEF

62.    CTIA incorporates the preceding paragraphs by reference as though set forth fully herein.

63.    The Minimum Rate Rule will cause CTIA members immediate injury for which there is no adequate remedy at law because it:  (1) requires CTIA members to impose a $5.00 minimum monthly service rate that is inconsistent with, and preempted by, federal law; (2) will cause CTIA members to lose customers and goodwill; and (3) requires CTIA members to incur substantial but incalculable economic and administrative costs, for which CTIA members will have no recourse, to meet, and prepare to meet, the Minimum Rate Rule's requirements.

64.    These injuries cannot be adequately compensated by money damages and will be irreparable absent preliminary and permanent injunctive relief.

65.    Accordingly, these injuries are redressable by the granting of appropriate injunctive relief enjoining the Commissioners from giving effect to or enforcing the Minimum Rate Rule.

## **PRAYER FOR RELIEF**

WHEREFORE, CTIA respectfully requests that this Court:

A.      Enter judgment in CTIA's favor;

B.      Permanently enjoin each and all of the Commissioners and their officers, agents, subordinates, and employees from giving effect to or enforcing amended Utility Rule 515-12-1-.35(3)(f), as adopted in the GPSC's January 29, 2013 Order attached hereto as Exhibit A and as proposed in the GPSC's January 18, 2013 NOPR attached hereto as Exhibit B, with respect to commercial mobile service providers;

C.      Declare that amended Utility Rule 515-12-1-.35(3)(f), as adopted in the GPSC's January 29, 2013 Order attached hereto as Exhibit A and as proposed in the GPSC's January 18, 2013 NOPR attached hereto as Exhibit B, as applied to commercial mobile service providers, is preempted by the Communications Act, specifically 47 U.S.C. § 332(c)(3)(A);

D.      Declare any action taken by each and all of the Commissioners and their officers, agents, subordinates, and employees pursuant to amended Utility Rule 515-12-1-.35(3)(f), as adopted in the GPSC's January 29, 2013 Order attached hereto as Exhibit A and as proposed in the GPSC's January 18, 2013

NOPR attached hereto as Exhibit B, against any commercial mobile service providers to be null and void;

E.    Issue all preliminary relief and process necessary and appropriate to prevent each and all of the Commissioners and their officers, agents, subordinates, and employees from taking any action pursuant to amended Utility Rule 515-12-1-.35(3)(f), as adopted in the GPSC's January 29, 2013 Order attached hereto as Exhibit A and as proposed in the GPSC's January 18, 2013 NOPR attached hereto as Exhibit B, against any commercial mobile service providers pending the conclusion of this case;

F.    Award CTIA its costs and reasonable attorneys' fees as appropriate; and

G.    Grant such additional relief as the Court may deem appropriate.

DATED:  February 5, 2013

Respectfully submitted,

_s/ David L. Balser_
David L. Balser (GA Bar # 035835)
*dbalser@kslaw.com*
Benjamin Lee (GA Bar # 443082)
*blee@kslaw.com*
Timothy H. Lee (GA Bar # 365087)
*tlee@kslaw.com*

KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
Telephone:  404-572-4600
Facsimile:  404-572-5100

*Attorneys for Plaintiff CTIA –
The Wireless Association®*